105 P.2d 484

## CHRISTMAS v. COWDEN.

No. 4468.

Supreme Court of New Mexico.

July 31, 1940.

Rehearing Denied Sept. 30, 1940.

Hervey, Dow, Hill & Hinkle and W. A. Dunn, all of Roswell, and Whitaker, Perkins & Turpin, of Midland, Tex., for appellant.

Atwood & Malone, of Roswell, for appellee.

MABRY, Justice.

This suit involves title to certain tracts of land in Lea County, formerly only grazing lands but of recent years they have become of great value because they lie in the midst of considerable and profitable oil development. It will not be necessary to particularly describe the land or any of the individual tracts except to denominate them as the parties have, as coming under groups 1 and 2. Group 1 contains an area of approximately 120 acres, and group 2 embraces an area of 80 acres, all being within an area measured by the extent of two township and two range lines. Appellee Christmas filed this suit to quiet title against appellant, and others not necessary to mention, obtained judgment and decree quieting her title as to all of the tracts involved, and appellant Cowden brings this appeal.

Appellant, as defendant below, interposed two defenses to appellee's claim of title: (a) That he is the owner in fee simple of all the lands through title acquired by adverse possession by his predecessors in title, either under the New Mexico statute in force prior to the amendment of 1899 when color of title and payment of taxes were made a prerequisite, by the common law twenty year statute of limitations (21 Jac. 1), or by virtue of the adverse possession statute (Sec. 83-122, N. M.Comp.St.1929) requiring color of title and payment of taxes. No reliance has been placed upon the tax paying feature, however, and this point will not be further noticed. And (b), that insofar at least as the tracts in group 1 are affected, that appellee's predecessors in title, Thomas J. Cowden, and his heirs at law, were never the owners in fact of any of the tracts of land, but held legal title only as trustees for the Cowden Cattle Company,

a co-partnership, and the individual members thereof, 7/10 of whose interests in all of the lands involved herein, if not all of said interests, appellant had purchased and then and now owns.

It appears that appellee, some ten years prior to the time of filing this suit, had filed and prosecuted to successful determination three other separate suits to quiet title to these lands; but that appellant and no member of the Cowden Cattle Company co-partnership or their heirs or successors in title were directly made parties. These three earlier suits each involved some parts of these tracts, but all of the three suits embraced as a total all the lands in question, and in said suits appellee named as defendants certain others who were found upon, or were using, the lands in question. The interests of these other parties, not now important, were wiped out by the separate decrees of these separate suits, in which said parties were defaulted for want of appearance and answer. If appellant is precluded by any of these said former suits and decrees, it is because he failed to respond and contest appellee's claim under notice and process directed to him as an "unknown claimant", or "unknown owner".

The Cowden Cattle Company, otherwise known and designated for years simply as "The Cowdens", came into the country about the middle eighties and there operated a cattle business and ranch, eventually extending over a wide area in southeastern New Mexico, including the area surrounding and in which is included some or all of the tracts here in question. There is no definite and satisfactory proof as to just when the Cowdens did commence their ranching operations and the exact area and lands embraced therein; but, by 1919, at least, the partnership had broken up and their operations had ceased.

Appellee Christmas in the trial below showed, as support for her title and as against the claim of appellant Ed. Cowden, first, that she had secured quit-claim deeds from the heirs of Thomas J. Cowden, deceased, with the records in Lea County showing no title in or claim of any kind upon, any of the lands in question, so far as appellant or his predecessors in title were concerned; and, second, that any claim which appellant may have had by virtue of any claim acquired through title by adverse possession on the part of his predecessors in title, or otherwise, did not survive appellee's three suits to quiet title hereinbefore mentioned.

Appellant, in addition to his other defenses hereinbefore mentioned, vigorously resists appellee's claim that he is cut off by her former suits to quiet title against him as an unknown claimant, and urges that the evidence, and some findings of the court, sustain his contention that at the time of the purchase by quit-claim deeds and the institution of the suits to quiet title, there were persons upon or occupying the land in question under and through appellant, or his predecessors in title, and that proper inquiry of these oc-

cupants and users of the land would have disclosed such fact, and that, therefore, he and his predecessors in title, or their heirs, should have been made parties by designation other than as "unknown" claimants or owners. It is clear that at any time material there was nothing of record in Lea county, where the lands are situated, to put appellee upon notice of any outstanding claim of appellant or any one through whom he claims, though, as to a part of the land, a deed from the heirs of Thomas J. Cowden to appellant's predecessors in title had theretofore been executed and delivered, but it was recorded in Eddy and not in Lea county, and therefore was ineffective as constructive notice.

We know that the interests of parties defendant cannot be cut off in such suits where designated and served constructively only as "unknown owners", if they are in possession. Pankey v. Ortiz, 26 N.M. 575, 195 P. 906, 30 A.L.R. 92. Possession by a tenant is, of course, equally good possession under this rule. And, a purchaser likewise takes at his peril when inquiry from one in possession, either the owner or another claiming under him, would disclose an interest not of record. McBee v. O'Connell et al., 19 N.M. 565, 145 P. 123.

The trial court made certain findings holding appellee had no knowledge or notice of appellant's claim and likewise absolved her of the charge of failure to further inquire of the occupants as to any other interest in or claim to the property.

Do such findings have substantial support in the evidence, and how shall we appraise such ultimate findings of fact viewed in the light of certain finding of evidential fact which appellant claims impels a contrary result?

Appellant apparently places his strongest reliance upon this question of notice to appellee through her husband and agent, prior to and at the time of bringing suits to quiet title and when she negotiated for the deeds from the heirs of Thomas J. Cowden. He says in his reply brief that "on the determination of this single issue the appellant might rest his whole case, did his counsel deem they could rightfully waive other defenses which they esteem to be valid." While the question of notice is important and was relied upon as one of the principal defensive weapons of appellant in the trial below, it may not be the principal point in the case. It certainly is not the only one.

But to first dispose of that question: The trial court made findings of fact which are supported by substantial evidence to the effect that appellee Christmas had no notice such as would bind her, as to any claims on the part of appellant or his predecessors in title at the time she secured her deed or at the time she filed or prosecuted to conclusion her suits to quiet title hereinbefore referred to. Appellant challenges these findings as not supported by substantial evidence. "Are the material facts bearing on notice based on evidence from which different or conflicting infer-

ences might reasonably be drawn?" appellant asks. He analyzes the testimony upon this point in an effort to persuade that they are not.

Appellant complains that as to most, if not all of the tracts in question, there was some character of occupancy at the time appellee, through her husband and agent, made inquiry to determine what, if any, rights the occupants claimed prior to securing the deeds from the Thomas J. Cowden heirs, or prior to instituting suits to quiet title. A proper inquiry to ascertain under whom, if anyone, such occupants were holding would have put appellee on inquiry, he says. We do not deem it necessary to say more in this connection than to point out that the court found appellee did make inquiry in all cases where possible, and where there was occupancy, as to what claim, if any, such occupants were in possession of or upon the land, and that nothing disclosed by the inquiries lead to any knowledge or information which would have called for further precaution by appellee.

We have examined the evidence in this respect and determine that it will support such findings. The trial court apparently felt that, as to any of the tracts and as to any one actually in possession at the time of purchase by quit-claim deeds, or just prior to the institution of the suits to quiet title, when appellant was reached only by process directed to "unknown claimants", that appellant put herself within the rule announced in McBee v. O'Con-

nell, 19 N.M. 565, 145 P. 123. No one claimed to be holding as tenant under appellant or any of his predecessors in title.

The testimony upon this point is quite lengthy and we deem it unnecessary to quote therefrom or to say more about it. Our examination of the evidence upon this point satisfies us that the findings are supported by substantial evidence.

Upon this question of notice appellant urges upon us consideration of the question whether certain findings of fact made by the trial court do not commit it to a conclusion in favor of appellant and contrary to that arrived at by the court. Particular reference is made to the court's finding as to the familiarity of B. A. Christmas, the husband of appellee, with the history and affairs of the Cowden Cattle Company for whom the said Christmas worked in 1909 and 1910. This finding was to the effect that he was familiar for years with the range where the company cattle grazed and generally with its watering places located in this state. There was no finding, however, that the said Christmas knew the land in question here to have been occupied and claimed by the company or its members. It is conceded that the husband of appellee was her agent and acted for her in all the transactions pertaining to acquisition of title to the lands in question.

Appellee, on the other hand, replies that any such general language as can be found in any of the numerous findings must be denominated nothing more than

findings of evidential, as distinguished from ultimate, facts, and that the court's ultimate findings of fact to the effect that appellee had no notice of any kind which would impute to her knowledge of, or put her upon inquiry as to, any hostile claim in this direction, wholly neutralizes any such effect as appellant would impute to any such evidential findings upon which he would rely.

We think appellee is correct in her contention. The trial court is called upon to make findings of the ultimate facts only. (Manning v. Atchinson, Topeka & S. F. Ry. Co., 42 N.M. 381, 387, 79 P.2d 922—special concurring opinion.) The court in this case made a great many findings, many, if not most of which, might properly be designated findings of evidential facts only, and unnecessary. However, we hold that none of the essential ultimate facts found are without substantial support in the evidence, and that none of them are inconsistent with conclusions of fact which can properly be drawn from the related and essential evidentiary facts found. We appreciate the difficulty trial courts face in this connection, in undertaking to distinguish between evidentiary and ultimate facts. In many cases it is not easy to differentiate.

A good definition of an ultimate fact is found in 65 C.J. 1190. It is there said:

"Always a relative term, it is difficult to lay down a rule that will exactly prescribe the boundaries within which the 'ultimate facts' in every case are confined. They are those found in that vaguely defined field lying between evidential facts on the one side and the primary issue or conclusion of law on the other * * *

"Considered with reference to the facts or evidence by which they are established or proved, 'ultimate facts' are but the logical results of the proofs, or, in other words, mere conclusions of fact. An 'ultimate fact' is the final resulting effect which is reached by processes of logical reasoning from the evidentiary facts."

The ultimate fact to be ascertained, in this case whether or not appellee's knowledge was sufficient to put her upon inquiry as to appellant's claim, is none the less a finding of fact because drawn as a conclusion from other facts. Kahn v. Central Smelting Company, 2 Utah 371, 376. This is true whether or not the finding is based upon undisputed or conflicting testimony. 3 Am.Jur. 472, pars. 903 and 905.

The trial court's findings of some of these evidentiary facts may have reasonably tended to confuse appellant, but it cannot aid him under the circumstances. We look to the ultimate facts found by the court. These are, so far as they affect notice, to the effect that notwithstanding any evidentiary fact or circumstance found to exist, the court believed the testimony and evidence offered in support of the contention, that appellee had no notice, or knowledge of anything that would have put her on notice, of any claim on the part of appellant or his pred-

ecessors in title, when she purchased the quit-claim deeds or instituted her suits to quiet title. When we find support in the evidence of such ultimate facts, our inquiry upon this point ends.

Appellant places much reliance upon his claim that the uncontradicted evidence shows that his predecessors in title had, through adverse possession of the lands in question from the year of 1887 until about 1919, established title invulnerable to any power of alienation resting in the heirs of Thomas J. Cowden, the record owner. His claim in this respect rests largely upon the question of whether twenty years of occupancy, without color of title or payment of taxes (the common law rule) would ripen into title. Another reliance, to be hereinafter discussed, which assumes the common law rule does not obtain, is upon a shorter period of occupancy and before color of title and payment of taxes were a prerequisite under our own statute of limitation.

Does the common law statute of limitations obtain in New Mexico? Appellant thinks it does. Appellee first challenges the right of appellant to rely upon this assignment of error, claiming that it was not pleaded or relied upon below. Appellant might have done more to bring the question more clearly to the attention of the trial court, but we are not prepared to say that it was not presented, and relied upon. We therefore examine into this assignment, presenting, as it does, not only an interesting but one of the important questions in the case.

The common law statute of limitations (21 Jac. 1) requires neither payment of taxes nor color of title as a condition to be established in proof of such claim. Our general statute of limitations (Act of Feb. 1, 1858, later enacted as Chap. 73, Sec. 2, C.L. 1865), likewise at the time material here, required neither. The act was amended by Chap. 63, Laws of 1899, to include payment of taxes, and color of title; and a later amendment, Chap. 76 of 1905, also required both payment of taxes and color of title, but imposed the condition in somewhat different language, not material here. The statute in its present form is found in Sec. 83-122, N.M.Comp. St.1929.

The common law statute of limitation, of 20 years, appellant says, must be in force in New Mexico. Appellee, on the other hand, argues that this statute was never in force here and points out that when the legislature on Jan. 7, 1876, adopted the common law of England "as recognized in the United States of America" to be the rule of practice and decision (Sec. 1823, Comp.Laws 1884, Browning v. Browning, 3 N.M. 659, 675, 9 P. 677) it did not adopt the common law statute of limitations (21 Jac. 1) for the reason that in the territory of New Mexico there was already upon the books and had been since 1858, a statute similar to the common law rule, except, that instead

of 20 years of occupancy being. required, only 10 years were necessary; and, that this condition would have presented a patent inconsistency fatal to the operation of the common law rule.

We said in. the early case of Browning v. Estate of Browning, 1886, 3 N.M. 659, 675, 9 P. 677, 684, that, in adopting. the common law, Lex Non Scripta, we adopted therewith only such "British statutes of a general nature, not local to that kingdom, nor in *conflict* with the constitution or laws of the United States, nor of this territory, which are applicable to our condition and circumstances, and which were in force at the time of our separation from the mother country." (Emphasis ours.)

A comparison of the common law provision (21 Jac. 1) with our Act of Feb. 1, 1858 (Chap. 73, C.L. 1865), might be helpful. The statute of 21 Jac. 1, provided as follows:

"For quieting of Mens Estates and avoiding of Suits, be it enacted by the King's most excellent Majesty, the Lords Spiritual and Temporal, and Commons in this present Parliament assembled, That all Writs of Formedon in Descender, Formedon in Remainder, and Formedon in Reverter, at any· Time hereafter to be sued or brought, of, or for any Manors, Lands, Tenements or Hereditaments, whereunto any Person or Persons now hath, or have any Title, or Cause to have or pursue any such Writ, shall be sued and taken within twenty Years next after the End of this present Session of Parliament: And after the said twenty Years· expired, no Person or Persons, or any of their Heirs, shall have or maintain any such Writ, of or for any of the said Manors, Lands, Tenements or Hereditaments; (2) and that all .Writs of Formedon in Descender, Formedon in Remainder, Formedon in Reverter, of any Manors, Lands, Tenements, or other Hereditaments whatsoever, at any Time hereafter to be sued or brought by Occasion or Means of any Title or Cause hereafter happening, shall be sued and taken within twenty Years next after the Title and Cause of Action first descended or fallen, and at no Time after the said twenty Years; (3) and that no Person or Persons that now hath any Right or Title of Entry into any Manors, Lands, Tenements or Hereditaments now held from him or them, shall thereinto enter, but within twenty Years next after the End of this present Session of Parliament, or within twenty Years next after any other Title of Entry accrued; (4) and that no Person or Persons shall at any Time hereafter, make any Entry· into any Lands, Tenements or Hereditaments, but within twenty Years next after his or their Right of Title, which shall hereafter first descend or accrue to the same; and in Default thereof, such Persons so not entering, and their Heirs, shall be utterly excluded and disabled from such Entry after to .be made; any former Law or Statute to the contrary notwithstanding.

"II. Provided nevertheless, That if any Person or Persons that is or shall be entitled to such Writ or Writs, or that hath or shall have such Right or Title of Entry, be, or shall be at the time of the said Right or Title first descended, accrued, come or fallen, within the Age of one and twenty Years, Feme Covert, Non Compos Mentis, imprisoned or beyond the Seas, that then such Person and Persons, and his and their Heir and Heirs, shall or may, notwithstanding, the said twenty Years be expired, bring his Action, or make his Entry as he might have done before this Act; (2) So as such Person and Persons, or his or their Heir or Heirs, shall within ten years next after his and their full Age, Discoverture, coming of sound Mind, Enlargement out of Prison, or coming into this Realm, or Death, take benefit of, and sue forth the same, and at no Time after the said ten Years."

The Act of February 1, 1858 which was enacted as Chapter 73, Section 2, C.L. 1865, provided as follows: "No person or persons or their heirs shall have, sue, or maintain any action or suit, either in law or equity, for any lands, tenements or hereditaments but within ten years next after his, her or their right to commence, have or maintain such suit shall have come, fallen, or accrued, and that all suits either in law or equity for the recovery of any lands, tenements or hereditaments shall be had and sued within ten years next after the title or cause of action or suits accrued or fallen, and at no time after the ten years shall have passed:

Provided, that if any person or persons that is or shall be entitled to commence and prosecute such suit or action in law or equity be or shall be, at the time of said right or title first accrued, come or fallen within the age of twenty-one years, feme covert, non compos mentis, imprisoned or beyond the limits of the United States and the Territories thereof, that then such person or persons, his, her or their heir or heirs, shall and may, notwithstanding the said ten years be expired, bring his or her suit or action, as he, she or they might have done before the passage of this act, so as such person or persons, his, her or their heir or heirs, shall within three years next after his, her or their full age, discoverture, coming of sound mind, enlargement out of prison, coming into the United States or the Territories thereof, or death, take benefit of and commence such suit, at no time after the said three years: Provided, also, that in the construction of this saving, no cumulative disability shall prevent this bar, but shall only apply to that or these disabilities which existed at the time when the right to sue first accrued and to no other: Provided further, that such action so commenced shall be an action prosecuted with effect and no other."

The striking similarity of the language of the two statutes, particularly as between paragraph II of the English Act and the portion of our own statute following the first proviso therein, is significant. It surely cannot be said that by the Act of 1858 we were not enacting a statute of

limitations governing title by adverse possession and that we did not there adopt substantially the English statute. Of necessity, there had to be a substitution of Old World names and terms to make the statute applicable here. Likewise a lapse of 150 years justifies some change in language. It may, or may not, represent an improvement. It does reflect the inevitable—growth.

Appellant relies upon the case of Browning v. Estate of Browning, supra, as supporting his position that the common law statute of limitation obtained at the time in question by virtue of the Act of Jan. 7, 1876. We are unable to see where that case affords him any aid. The Browning case had to do with limitation of actions upon a promissory note simply, and the question was whether, in the absence of any statute of our own upon the question, the common law rule governing limitations in such cases, or the rule obtaining in Mexico at the time of our acquisition of the New Mexico territory, governed. The court there, in an able and well reasoned opinion, laid down the rule by which it was to be determined what was meant by the statutory language used in the Act of 1876 with reference to the common law, and held that, as to promissory notes, the British statute of limitations (21 Jac. 1) falls within this category, and became the law of limitations here in 1876, abrogating the Mexican law theretofore in force. As we have said, we then had no statute upon the question of the limitation of time to sue upon a promissory note or like cause of action, and the point here presented and decided had to do simply with whether the Mexican Law, which would otherwise have been followed, was superseded by the 1876 Act.

Appellant further urges upon us a consideration of the fact that if we are to hold that there can be no application of the common law rule, then there was and is no way of obtaining title to land by adverse possession without the burdensome condition of color of title and payment of taxes. But, would that situation weaken the logic of appellee's contention? We think not. The question is: Would there be a "conflict" with the laws of the territory—with the Act of 1858 hereinbefore set out—if we were to hold that under the general terms of the 1876 Act, this common law statute of limitations as it applies to title to land by adverse possession, was adopted? We think there would be, clearly and unequivocally. A reading of the two Acts (21 Jac. 1 and the Act of Feb. 1, 1858, supra) must convince that both deal with the same subject and embody like requirements for the establishment of such title, except, that under one Act twenty years of occupancy is required, while under the other, ten years is declared sufficient. Neither Act mentions the payment of taxes and under neither is claim under color of title a prerequisite.

It would seem, therefore, that we charge to the legislature of 1876 poverty

of imagination and purpose to hold that it intended to substantially duplicate this legislation. But, Mr. Justice Brinker, in the Browning case, in laying down the definition of the common law which the legislature undertook to adopt in 1876, sets up a clear guide post for our direction when he limits the common law and British statutes so adopted at that time, to those not "in conflict with the constitution or laws of the United States, nor of this territory, which are applicable to our condition and circumstances * * *".

There was doubtless some reason for our early territorial legislature of 1858— only twelve years after our conquest of this territory—to fix the required period of occupancy at ten rather than twenty years. This court in Montoya v. Heirs of Vigil, etc., 16 N.M. 349, 120 P. 676, discusses in a general way the applicability of our condition, including the customs and needs of the people of this territory, to the companion statute, Sec. 83-119. What was there said, it seems, would likewise, and with equal good reason, apply to the reason which prompted the fixing of a reasonably short period of occupancy for an effective statute of limitation such as we have in Sec. 83-122, enacted in its original form at the same time (1858). The common law period of twenty years may have been deemed too long to suit the "conditions" of our people and our country.

We do not, of course, inquire into the motives of the legislature, when we have determined it has the power to act. Amarillo—Pecos Valley Truck Lines, Inc. v. Gallegos, etc., 44 N.M. 120, 99 P.2d 447. In the Browning case, supra, the writer of the opinion, espousing the rule that the term "common law" is somewhat restrictive, also points out that the Congress did not intend by the use of the word "common law" in the organic act, "to speak into existence here the common law of England in all its fullness." Continuing, the author of this opinion says:

"It cannot be reasonably held that the purpose of congress was to strike down and destroy this system of laws, under whose influence these people had always lived, and impose upon them, by these equivocal words, laws in a language foreign to them, and of which they had no knowledge,—laws whose terms, conditions, penalties, extent, and limitation bore little, if any, resemblance to those by which they had always been governed. United States v. Percheman, 7 Pet. 51 [8 L.Ed. 604].

"The just interpretation of the section under review is that it created courts of general jurisdiction in which all rights of persons and things, whether arising under the civil law as it obtained in Mexico prior to the treaty of session, or under the common law, the acts of congress, or the statutes of the territory, should be protected and enforced. Perris v. Higley [20 Wall. 375, 22 L.Ed. 383], supra; Territory v. Flowers, 2 Mont. 531; Kearney, Code, C.L. 1865, p. 512."

It should be noted here that we had "lived under the influence" of the act of 1858 many years when the so-called common law adoption act was passed.

This court in the case of Territory v. Maxwell, 1882, 2 N.M. 250, declined to follow the common law rule of England in a criminal case which involved the description of property in a prosecution for embezzlement, for the reason our own statute greatly "enlarged" the application of the common law rule upon which the English cases relied upon were based. The foregoing statement and citation from these early New Mexico cases are perhaps apropos to no more than support for the contention that it is the policy of our courts to first search our own statutes for commitments upon a question before we invoke the common law, where it is adopted by language similar to that found in the organic act of 1850, or in our legislative act of 1876.

While this exact question has not been heretofore directly presented to this court, and we have not therefore passed directly upon it, in our treatment of kindred issues in several other cases where the question of title to land by adverse possession was involved, we have assumed, or rather clearly indicated, that New Mexico recognizes no such common law statute of limitations. We have invariably pointed to, discussed and relied upon, none other than our two familiar statutes, Sec. 83-119, Comp.St.1929, the one dealing with lands within land grants, and

Sec. 83-122, a general statute of limitation. See Stamm v. City of Albuquerque, 10 N.M. 491, 504, 62 P. 973; Montoya v. Heirs of Vigil, 16 N.M. 349, 120 P. 676; Jenkins v. Maxwell Land Grant Co., 15 N.M. 281, 107 P. 739; Manby v. Voorhees, 27 N.M. 511, 203 P. 543; Jackson v. Gallegos, 38 N.M. 211, 219, 30 P.2d 719; Gehman v. Lair, 35 N.M. 17, 288 P. 604; Hester v. Sawyers, 41 N.M. 497, 71 P.2d 646, 112 A.L.R. 536 and Wilson v. Williams, 43 N.M. 173, 87 P.2d 683, 685. In the Stamm case it seems to have been assumed that ten years was the period required to establish a prescriptive right to maintain a ditch over the premises of another. In Hester v. Sawyers, supra, it was held directly that the period of use for acquiring title by prescription corresponds to the local statute of limitation for acquiring title to land by adverse possession, and that this period is ten years. In the more recent case of Wilson v. Williams, supra (1939), where we were likewise dealing with a question of prescriptive right—in this case, the right to the use of another's land for a public road—we cited with approval Hester v. Sawyers and restated the rule to be, "that the period of use for acquiring such prescriptive rights, corresponds to the local statute of limitation for acquiring title to land by adverse possession. This period is ten years."

In the case of Gehman v. Lair, supra, it was likewise assumed that we recognized only our own statute of limitations and not the common law. This was a

case, however, where any statement justifying this appraisal was not necessary to a decision and was dictum.

In another recent case, Ward v. Rodriguez, 1939, 43 N.M. 191, 88 P.2d 277, 279, we clearly assumed, if we did no more, that in this jurisdiction title by adverse possession must be established upon the authority of one of our two statutes, viz., 83-119, N.M.Comp.St.1929 (which like its companion statute, Sec. 83-122, was passed in its original form at the legislative session of 1857–58 and "which applies to property acquired within a Spanish or Mexican land grant"), or Sec. 83-122, supra. See Montoya v. Heirs of Vigil, supra, for a helpful discussion of the history of both of these sections, tracing amendments thereto, etc.

██ We said in the Ward case, referring to Sec. 83-122, that "this is a general statute of limitation, as distinguished from Sec. 83-119, Comp.Stat.1929, which applies to property acquired within a Spanish or Mexican land grant." It is quite clear from our approach to the subject of adverse possession and our treatment of the questions in both the Jackson and Ward cases, supra, that we have already indicated that title by adverse possession, except as to property acquired within a Spanish or Mexican land grant, is established *only* under Sec. 83-122, which fixes the period of occupancy at ten years, and which, since the amendment of 1899, requires of the party claiming adverse possession, his predecessors or grantors, that they have for that period of time continuously paid all the taxes.

Then, if it be the law that title by adverse possession as by the common law (21 Jac. Chap. 16) could not be acquired, as we now hold, then appellant's only remaining reliance must be upon his showing, that he has established title by adverse possession, through occupancy and in accordance with other conditions attendant upon adverse possession as prescribed by the New Mexico statutes, between the years 1887 and 1899. The latter year fixes the date when, by amendment of the act of 1858, payment of taxes became an essential in support of claim of title by adverse possession, as we have said. (Chap. 63, Laws of 1899.) We examine the evidence to determine whether the trial court was justified in finding that no such right or title had been established, even as to the limited time of ten years, within this period.

It is clear that the court made no finding that would support defendant's claim of title by adverse possession for ten years, within this period. There is no finding by the court, nor is there any clear and uncontradicted evidence in the record, to show when possession of any of the individual tracts in question was initiated. Appellant, perhaps, relies upon the court's findings No. 49, to show occupancy for "many years" prior to 1919, the time the court found that the Cowden Cattle Company had retired before the advance of the incoming homesteaders. This finding af-

fords appellant no aid. The finding is to the effect that "The Cowden Cattle Company for a great many years operated a cattle ranch on the surrounding tracts involved in this action."

To have operated a ranch upon and to have had possession of surrounding tracts for "a great many years" is pretty indefinite. It seems that cattle of the Company ran rather loosely over a large area both away from and in the vicinity of the land in question. The trial court must have been influenced in its findings against this occupancy being of a character that would bring appellant and his predecessors within the rule, by its evident indefiniteness as to character, time and period of occupancy, and as it failed to clearly identify the land involved.

In Jenkins v. Grant Company et al., 15 N.M. 281, 288, 107 P. 739, 741, we approved language used by the trial court to the effect that "from a practical standpoint the grazing of livestock in this country has no value as evidence of practical location." We there affirmed the judgment of the trial court in holding title by adverse possession of lands claimed to have been used for grazing was not established by the facts presented.

The evidence of adverse, exclusive and notorious occupancy by appellant's predecessors in title is not sufficiently clear and uncontradicted as to impel us to hold that the trial court's findings are without substantial support in the evidence. We inquire no further than this.

Certainly the testimony as to the existence of a Cowden ranch in 1900 and for many years prior thereto is all of a very general nature. It is merely to the effect that there was such a co-partnership undertaking in existence, using, and probably claiming, some considerable lands through occupancy somewhere in the vicinity of the land in question. Proof of such title must be clear and definite. The burden of proof is upon the claimant of title by adverse possession. Ward v. Rodriguez, supra.

We have said that "what is adverse possession is one thing in a populous country, another thing in a sparsely settled one, and still a different thing in a town or village." Baker v. Trujillo De Armijo, 17 N.M. 383, 391, 128 P. 73, 76. For instance, under some conditions that there need not be a fence, building or other improvement and that "the uses to which the property can be applied, or to which the owner, or claimant, may choose to apply it, the nature of the property, and its situation are largely controlling factors in determining what acts of ownership might be considered requisite to the assertion of an adverse claim." Baker v. Trujillo De Armijo, supra.

But, under any circumstance the burden is upon the claimant to establish by clear and convincing proof that he or his predecessors have for the period of time required by the statute, met all of the conditions precedent to the ripening of such title. In Montoya v. Catron, 22 N.M. 570, 166 P. 909, 910, we approved the following

statement from Jackson v. Sharp, 9 Johns., N.Y., 163, 167, 6 Am.Dec. 267, stating: "It is a settled rule that the doctrine of adverse possession is to be taken strictly, and not to be made out by inference, but by clear and positive proof. Every presumption is in favor of possession in subordination to the title of the true owner."

We also approved the following statement from 2 C.J. 276: "It is very generally held that to prove title by adverse possession, or any single element thereof, the evidence should be clear and convincing. It is also a rule of general application that such possession or element cannot be established by loose, uncertain testimony which necessitates resort to mere conjecture. Title by adverse possession cannot be established by inference or implication."

And likewise we approved the following language from Jenkins v. Maxwell Land Grant Co., 15 N.M. 281, 107 P. 739, which is, of course, a statement of the universally recognized rule, where it was said: "That to constitute adverse possession the occupancy of one so claiming must be: (1) actual; (2) visible; (3) exclusive; (4) hostile; and (5) continuous. If any one of these is lacking, no title by adverse possession can ripen."

We hold there is substantial evidence in the record to support the court's finding that appellant's proof fails to establish his claim to title by adverse possession under any theory or for any period of time.

Appellant relies upon the additional defense that when Thomas J. Cowden took title by patent to at least some of the tracts of land in question, he took such title merely as agent and trustee for the benefit of the company, that the said Thomas J. Cowden himself at no time had any interest therein, and that the issuance of the patent title to the lands (which was after the death of Thomas J. Cowden) vested in his heirs, as trustees for the Cowden Cattle Company, only the naked legal title. Appellant claims to have acquired the equitable title to the extent of a 7/10 interest therein, if not the entire interest, and that the heirs of Thomas J. Cowden from whom appellee obtained her title, holding as trustees and the naked legal title only, had nothing to convey.

The court found upon that point contrary to appellant's contention, however, and held that the evidence did not show that the selection and application for these lands were made for the benefit of any other person than Thomas J. Cowden. There is likewise substantial evidence in the record, though it is severely challenged by appellant, to support such finding. We hold this assignment to be without merit.

There is another question presented which would defeat appellant's claim if the points heretofore decided adversely to him would not have done so. It appears from the record that patents as to the lands in question were issued in the name of the applicant, Thomas J. Cowden,

long after his death. As to group 1, including 120 acres, the patents were issued in May, 1922, and as to group 2, embracing two 40 acre tracts, patents were issued in October, 1917. It therefore appears that since the Cowdens went out of the cattle business by 1919, there could have been no adverse holding of any of the lands for a longer period than two years after date of earliest patents. This is in line with the holdings of the United States Supreme Court that adverse possession of public lands cannot begin until issuance of patent therefor. See leading cases of Gibson v. Chouteau, 13 Wall. 92, 80 U.S. 92, 20 L.Ed. 534, 535; Redfield v. Parks, 132 U.S. 239, 10 S.Ct. 83, 33 L.Ed. 327; see also Hemphill v. Moy, 31 Idaho 66, 169 P. 288. This is a Federal question and the decisions of the United States Supreme Court are binding upon the states. Slaght v. Northern Pacific Ry. Co., 39 Wash. 576, 81 P. 1062; Utah Copper Co. v. Eckman, 47 Utah 165, 152 P. 178, and later cases citing and relying upon these earlier authorities, to wit, Peterson v. Johnson, 1934, 84 Utah 89, 34 P.2d 697; Sorenson v. Korsgaard et ux., 1933, 83 Utah 177, 27 P.2d 439, 441.

 The authorities cited by appellant and relied upon when he says there is a division of authority upon the question, are not in point and should be distinguished. As was said in the case of Utah Copper Co. v. Eckman, supra [47 Utah 165, 152 P. 179], following the Federal rule:

"The principle which is applicable to the case at bar must, however, not be confounded or confused with the doctrine of adverse possession laid down in the following cases: Blumer v. Iowa, etc., Land Co., 129 Iowa 32, 105 N.W. 342, 113 Am.St.Rep. 444; Missouri Valley Land Co. v. Wiese, 208 U.S. 234, 28 S.Ct. 294, 52 L.Ed. 466; Boe v. Arnold, 54 Or. 52, 102 P. 290, 20 Ann. Cas. 533, and note. The doctrine that prevailed in those cases is stated by the Supreme Court of Oregon in Boe v. Arnold, supra, in the following words:

" 'One claiming title to land by adverse possession for (the statutory period) as against all persons, but recognizing the superior title of the United States government, and seeking in good faith to acquire that title, may assert such adverse possession as against any person claiming to be the owner under a prior grant' from the government."

The cases cited in this quotation from the Utah case are from the same line upon which appellant relies. It appears *title had passed* from the government, and the question in most of these cases was whether or not possession by one, who mistakenly thought title to be in the government, would be sufficient adverse possession to vest title by limitation in the occupant as against the person claiming *under a prior grant* from the government. The essence of the question in most of such cases being simply whether or not possession was under a claim of right in the occupant if he admitted that he thought title was vested in United States.

There are other points raised and argued by the parties but we do not deem discussion thereof now necessary. Finding no error the judgment will be affirmed and it is so ordered.

BICKLEY, C. J., and ZINN and SADLER, JJ., concur.

BRICE, J., did not participate.